UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
JOHN DOE,                                                           Civil Action No.:

                          Plaintiff,

    -against-                                                      Trial by Jury Requested


TRACY HAAS, SUZANNE SHANE, and
THE STATE UNIVERSITY OF NEW YORK
AT STONY BROOK



                       Defendants
-------------------------------------------------------------------------X


## **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES**

      COMES NOW Plaintiff, John Doe, by and through his attorneys, GOMBERG LEGAL,

P.C., and brings this Complaint for Injunctive and Declaratory Relief and Damages against

Defendants. In Support thereof, Plaintiff States as follows:


## **INTRODUCTION**

    1.     This action is for due process violations under the Fourteenth Amendment to the

United States Constitution, pursuant to 42 U.S.C. §1983 and pursuant to 28 U.S.C. § 2201; and for

sex and gender based discrimination under Title IX of the Education Amendments of 1972, as

amended, 20 U.S.C. §1681, *et seq.*

    2.     This is a suit seeking relief for Defendant public-university The State University of

New York at Stony Brook (hereinafter "SBU" or "the University") adjudication of Plaintiff John

Doe for alleged violations of the sexual misconduct provisions of the Stony Brook University Code

of Student Responsibility (hereinafter also referred to as "SBU's Code"). That adjudication was

marred by substantial constitutional violations in violation of 42 U.S.C. §1983 and gender discrimination.

3.    In his first year of attending SBU, male Plaintiff John Doe rejected several romantic advances by "BG"—a female classmate,[1] but one late night, on March 5, 2018, when Plaintiff was highly intoxicated, BG invited herself to Plaintiff's dormroom and initiated sexual intercourse with him. Due to Plaintiff's level of intoxication, BG's conduct violated SBU's Code. *See SBU Code Sec. VII.C.6.a.*

4.    The following day, BG messaged Plaintiff about the sexual episode and quickly grew frustrated. Although, according to BG's own account, the sexual episode began and ended on terms *she* consented with, she here accused Plaintiff of attempting non-consensual anal intercourse in the middle of the sexual encounter. Plaintiff indicated that he neither remembered nor believed this incident occurred, and then stopped responding. BG threatened "[i]f you don't respond I'm going to report you." Plaintiff then reminded her he was highly intoxicated the prior night and that he was unaware of such an incident. BG proceeded to tell Plaintiff he was "bad in bed." Plaintiff ceased responding.

5.    Five days later, BG made good on her threat and filed a Complaint with SBU against Plaintiff alleging non-consensual intercourse.

6.    Plaintiff filed a cross-complaint based on his *own* inability to consent to the sexual interaction on account of his considerable intoxication. At around the same time, BG also published a public "post" on social media with Plaintiff's name, image, and a caption describing Plaintiff as her 'rapist" and inciting others to "beat [Plaintiff] up." This was likewise in clear violation of SBU's Code.

---

[1] Some individuals referred to throughout the remainder of the Complaint shall be named by pseudonymous initials, in order to maintain their anonymity in accordance with the underlying University procedure.

7.      Almost five months later, Defendants adjudicated these cross-complaints in a one-day hearing on August 10, 2018. Defendants' adjudication of these cross-complaints was constitutionally deficient and discriminated against Plaintiff based on his gender in multiple respects.

8.      First, regarding due process, Plaintiff was ***prohibited*** from cross-examining BG, notwithstanding essentially her entire complaint rested on her credibility and notwithstanding that she provided conflicting statements throughout Defendant SBU's investigatory phase and during the Hearing. Instead, Plaintiff was permitted only to submit questions to a "Hearing Officer" who would then ostensibly pose them to BG. The Hearing Officer, Defendant Tracy Haas, declined to ask many of the questions Plaintiff submitted.

9.      Defendants further prohibited Plaintiff from examining BG's most critical witness *in any respect*. This witness, "AH"—whom BG visited and spoke with immediately following sexual intercourse with Plaintiff—was questioned by SBU's Title IX[2] Investigator and made no mention of BG discussing any violative activity with him, let alone nonconsensual anal penetration. Instead, in his interview with SBU's Investigator, AH recalled that BG was frustrated with Plaintiff's lack of emotional intimacy and failure to reciprocate her affections, namely stating "frat boys are stupid" and that Plaintiff was "bad at sex...how a guy would be in a porno like no eating her out and stuff." BG then, within days of the August 10, 2018 Hearing, *directed AH to submit a conflicting statement that contained reference to her anal intercourse claim*, which Defendants accepted into evidence. Plaintiff believed it was absolutely critical that AH be questioned about these inconsistencies at the Hearing. Yet, whereas other witnesses were called for the hearing, Defendants ***refused*** to call AH for the *sole* reason that BG insisted he not be called.

---

[2] Throughout the Complaint, the term Title IX is used to refer to the procedural framework that Defendant SBU has created ostensibly to comply with federal statutory obligations under 20 U.S.C. §1681, *et seq.*

10.     Second, regarding gender discrimination, Defendants serially accorded BG preferential treatment in a manner that is explicable only on the basis of gender. For example, although Defendants rigorously applied their procedural rules to prohibit Plaintiff from introducing evidence at the Hearing, they permitted BG to violate the very same rules to introduce evidence of her own. As noted, Defendants also allowed BG to veto Plaintiff's examination of the most critical witness. Defendants further assisted BG throughout questioning in order to minimize and help rectify her conflicting testimony, while paradoxically, inquisitorially, and aggressively questioning Plaintiff until he provided answers that Defendants considered adverse to his allegations. And, most significantly, Defendants found BG 'Not Responsible' for any SBU Code violations despite clear evidence of her violations, while simultaneously finding Plaintiff 'Responsible'[3] for violating SBU's Code on the basis of a purported admission that *he never made*.

11.     Plaintiff was suspended from the University, placed on disciplinary probation, stripped of his scholarship, and his record and transcript permanently marked with a notation demonstrating a sexual misconduct violation. Plaintiff now seeks declaratory and injunctive relief to overturn Defendants' finding of 'Responsible' for the sexual misconduct violations alleged by BG, to remove the disciplinary suspension mark from Plaintiff's record and transcript, to reinstate Plaintiff's Presidential Scholarship, and for damages against Defendants for violations of Plaintiff's Constitutional rights to Due Process and Equal Protection.

---

[3] SBU denotes a party's guilt by finding them 'Responsible' or 'Not Responsible.'

4

## PARTIES

12.     At all times relevant to this Complaint, Plaintiff was a resident of the City of New York, County of Queens, State of New York.

13.     Plaintiff is currently an enrolled student at SBU.

14.     Defendant SBU is a state university, entitled to all vested benefits so enacted by congress. At all times relevant to this Complaint Defendant SBU provided education and educational services to students within the State of New York. Defendant The State University of New York at Stony Brook ("SBU" or "the University) is a public university with its main campus located on 100 Nicolls Road, Stony Brook, New York 11794, in the Eastern District of New York.

15.     Defendant Tracy Haas (hereinafter "Defendant Haas"), upon information and belief is a faculty member employed by SBU, and was, at all times relevant, the Title IX Review Panel Hearing Officer, and, upon information and belief, resides in the state of New York. Defendant Haas is sued both in her official and individual capacity.

16.     Defendant Suzanne Shane (hereinafter "Defendant Shane") upon information and belief is a faculty member employed by SBU, and is or was, at all times relevant, the associate managing counsel for SBU, and, upon information and belief, resides in the state of New York. Defendant Shane is sued both in her official and individual capacity.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this civil action pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331, and 28 U.S.C. § 1343 (3) and (4) because this is a civil action brought against the Defendants seeking immediate equitable relief from irreparable harm as well as compensatory and punitive damages for the deprivation of Plaintiff's Due Process rights under the Fifth and Fourteen Amendments to the Constitution of the United States, as well as for the Defendants' sex

5

discrimination under Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §1681, et seq.

18.     Venue is properly laid in this Honorable Court under 28 U.S.C. 1391(b)(1),(2) because the Defendant state actors deprived Plaintiff of his constitutional rights to Due Process and Equal Protection causing irreparable harm, in Suffolk County and Queens County, the State of New York; as such, the depredations complained of in this civil action occurred within the Eastern District of New York.

## FACTS

19.     Plaintiff enrolled in Stony Brook in August 2017. He and BG knew each other in the year prior to enrollment within SBU. In particular, Plaintiff and BG worked a tutoring job together and, as evidenced by messages exchanged between Plaintiff and BG, BG exhibited affection for Plaintiff.

20.     Plaintiff was enrolled in SBU on a pre-medical school track with an anticipated major in Physics.

21.     Because of his excellent high school and standardized testing credentials, Plaintiff was offered and accepted a merit-based University Scholarship, the Presidential Scholarship, from SBU. This scholarship was crucial in allowing Plaintiff to afford tuition for SBU. Plaintiff comes from a family of limited financial means.

22.     To retain the SBU Presidential Scholarship, Plaintiff was required to abide by certain terms and conditions including, *inter alia*, not being found in violation of SBU's Code.

23.     Plaintiff maintained his Presidential Scholarship throughout his first semester and also began his second semester at SBU as a Presidential Scholar.

## UNDERLYING SEXUAL EPISODE

24.     In or around January of 2018, BG enrolled in SBU for the spring 2018 semester.

25.     After BG enrolled in SBU, in or around February of 2018, she embarked on a series of attempts to develop a relationship with Plaintiff. For example, BG invited Plaintiff to join her in attending a party, she also invited Plaintiff to join her for a dinner date. Plaintiff declined these invitations because he was not interested in a romantic engagement with BG, and although he viewed her as a friend, he was concerned about what message he would send if he reciprocated some of these advances.

26.     On March 5th, 2018—the day of the underlying incident—Plaintiff began consuming alcoholic beverages with a number of friends and continued drinking into the evening hours.

27.     Later that evening, Plaintiff, accompanied by a friend, went to a dining hall within the University.

28.     While at the dining hall and heavily intoxicated, Plaintiff sent out a mass message "Snapchat[4] picture and video" of himself demonstrating his visible intoxication. This, because it was sent en masse, was visible to many of Plaintiff's contacts and other social media acquaintances, including BG.

29.     In response to this mass message, BG messaged Plaintiff requesting that he "invite [her] over" to his dorm. Plaintiff's friend who was accompanying him at the dining hall encouraged Plaintiff to extend the invite. Although as expressed earlier, Plaintiff was reluctant to engage in

---

[4] Snapchat is a messaging platform that allows its users to send pictures and videos to all of their "friends" or to specific "friends" at their discretion. Those messages are automatically cleared after 24 hours so that neither the sender nor the recipient can thereafter retrieve said messages.

romantic relations with BG, in his heavily intoxicated state, and without thinking clearly, he did in fact extend the invitation.

30.     In her own words, BG then "put on her cutest underwear and clothes" and travelled to Plaintiff's dorm.

31.     Plaintiff and BG sat together in the common area of Plaintiff's dormroom where there was a TV and a couch. In the adjoining bedrooms, a number of Plaintiff's suitemates were asleep.

32.     At this time, Plaintiff was still heavily intoxicated.

33.     Plaintiff and BG initially sat on the couch and began watching TV, however BG quickly initiated physical and romantic contact with Plaintiff, including climbing onto his lap so she was straddling him with her back to the TV.

34.     BG also initiated a variety of other intimate contact, such as rubbing her hands on Plaintiff's body, removing her clothing, and kissing his neck.

35.     BG and Plaintiff began engaging in protected sexual intercourse, which, according to BG's own telling, was consensual and was, in her view, desired.

36.     At some point during sexual intercourse, BG pushed Plaintiff off of her and requested whether Plaintiff had another condom. BG would later claim that the reason she pushed Plaintiff off of her was because he penetrated her anus, whereas she had only consented to vaginal intercourse. Plaintiff has no recollection of this incident occurring, in large part because he was heavily intoxicated.

37.     As BG admitted, she wanted to continue having sex with Plaintiff that evening even after the alleged incident, however, and because Plaintiff did not produce another condom, she instead decided, without any indication of Plaintiff's consent, to perform oral sex on him.

38.    At some point oral sex was stopped due to Plaintiff's lack of engagement. BG put her clothes back on and attempted to embrace and affectionately cuddle with Plaintiff on the couch, but Plaintiff did not reciprocate said affection.

39.    After Plaintiff did not reciprocate BG's affection, BG left.

40.    Although the following day was a school day, and it was approximately 3:00am, upon departing from Plaintiff's dormroom, BG messaged "AH" (a male friend) and asked to visit his dorm room immediately.

41.    When BG arrived at AH's dorm shortly thereafter, BG began expressing to him that "frat boys are stupid." After expressing frustration with Plaintiff, BG "cuddled" with AH in AH's bed and indicated that she had just had sex with some guy who was "bad at sex" and she did not enjoy it. BG complained to AH that Plaintiff performed like "how a guy would be in a porno, like no eating her out and stuff."

42.    BG left AH's dorm later that same early morning of March 6, 2018, came back to her room, talked to her roommate briefly and then studied for a few hours for an exam that morning.

## THE DAYS FOLLOWING THE INCIDENT

43.    After BG's exam, at around 11:30am (Tuesday, March 6, 2018), BG spoke with a counselor at SBU's Counseling and Psychological Services (CAPS) to whom she admitted to having consensual sex with Plaintiff.

44.    Later that night (the night of March 6th, 2018), BG messaged Plaintiff via Facebook Messenger:

9

"BG: Was yesterday intentional? Did you intentionally move away from vaginal sex and started with anal sex or was it a legit accident and you didn't see what you were doing in the dark.

Plaintiff: What

Plaintiff: No

BG: No it wasn't intentional?

BG: Was it an accident?

Plaintiff: Yes anal [is] nasty

BG: You honestly couldn't tell the difference by sensation

[Plaintiff did not respond] "

45.     The next morning (March 7, 2018), BG returned to SBU's Counseling and Psychological Services (CAPS) to speak about her experience regarding the sexual encounter.

46.     The CAPS counselor advised BG take a Rape Kit Exam and file a Title IX complaint because, upon information and belief, SBU's internal procedures and guidelines direct this practice. BG refused to take the Rape Kit exam because she "wasn't comfortable with a rape kit."

47.     Later that afternoon, BG messaged Plaintiff again.

48.     BG reiterated for Plaintiff to "stop acting like an ass for long enough to answer the questions…did you do it on purpose or not…I consented to vaginal sex not anal sex" and "[i]f you don't respond I'm going to report you," to which Plaintiff expressed his confusion as to what BG was talking about, and stated he "didn't even know [anal penetration] happened."

49.     The March 7th, 2018 correspondences between Plaintiff and BG concluded with Plaintiff reiterating "[I don't know] what [you're] talking [a]bout but then again I was not sober at all so [I don't know]," to which BG simply replied "[y]ou're bad in bed."

50.     In the following days, BG messaged a series of her acquaintances as evidenced by Facebook, Snapchat, and text messages, which were later submitted to the Title IX Hearing Panel in incomplete, cut off, and, curated format. Although these messages are tangential to Plaintiff's claims, they are important because they are highly suggestive of a pre-meditated effort by BG to corroborate a false version of events.[5] Many of these messages were sent under highly suspicious circumstances.

51.     For example, BG sent a lengthy Snapchat message to a friend discussing the incident. Although, as noted earlier, *See supra n.4*, Snapchat messages automatically delete within 24 hours, the friend took a screenshot of this message at BG's directive so it was effectively saved (and was, in fact, introduced as evidence in the Title IX proceedings).

52.     BG also sent a series of messages to another acquaintance. However, as was later revealed at the Hearing, BG was speaking with this acquaintance over the phone while she and the acquaintance concurrently drafted these messages to each other, which would later be used against Plaintiff.

53.     Importantly, BG confirmed in many of the messages she submitted, that Plaintiff was under the influence or not sober, and that BG knew this.

54.     On or about March 12, 2018, after exchanging many of these important messages, BG filed a Complaint with Defendant SBU accusing Plaintiff of non-consensual anal penetration (she did not file a complaint regarding any other sexual acts that evening).

---

[5] Self-serving hearsay statements are admissible within the University's sexual misconduct Title IX Review Panel Hearings.

## EVENTS FOLLOWING THE FILING OF BG'S COMPLAINT

55.     On March 25, 2018, BG posted an online article/Blog Post on "Her Campus Stony Brook" (an online website for female students to share their experiences at SBU) that described her memory of the sexual interaction with Plaintiff. This posted article contained numerous statements that seriously call into question the veracity of BG's version of events (as formalized in her Complaint with SBU), her mental state, and motive.

56.     Some examples of these statements by BG within her aforementioned Blog Post include, "I haven't let anyone hug me since then"; "…he didn't touch me. He did not kiss my neck. He did not touch my breasts. His lips touched me nowhere except my own lips"; "I carefully did my makeup, put on my cutest underwear"; "I climbed onto his lap and started kissing him"; "I remember the way he wouldn't look at me as he told me to get home safe in a bored tone."

57.     At or around the same time, Plaintiff had a series of conversations with the friend who had directed Plaintiff to indeed allow BG to come over that night. One of those conversations occurred prior to receiving notice of BG's Complaint. In that conversation Plaintiff discussed his distress at the incident, after all, he had been attempting to avoid romantic interactions with BG. Another one of those conversations occurred subsequent to Plaintiff receiving notice of BG's Complaint. In that conversation Plaintiff's friend encouraged Plaintiff to file his own Complaint based on Plaintiff's descriptions of the incident.

58.     On March 28, 2018, Plaintiff filed his own Complaint with Defendant SBU against BG alleging that, due to his heavily intoxicated state, he was unable to consent to sexual intercourse within the definition of SBU's Code.

59.     Shortly after filing his Complaint, Plaintiff was warned that BG was inciting others to attack Plaintiff. Specifically, Plaintiff was informed that BG posted a picture onto her Instagram

social media profile. That post included an image of Plaintiff's face and name, the location of Plaintiff's university dorm building, identification that Plaintiff "ended up fucking raping [BG]," and an invitation for others to "beat [Plaintiff] up."

60.     Plaintiff was highly alarmed. In addition to the open invitation to violence, which was frightening enough on its own terms, Plaintiff had now been falsely accused of rape in a public setting (many people had access to BG's Instagram social media post). Plaintiff believed that word about this post would spread quickly across campus and that his reputation and physical safety were in serious danger. Accordingly, Plaintiff immediately informed SBU's Office of Community Standards in the hopes that they would take remedial action.

61.     SBU, in fact, said there was nothing they could do. Instead, they indicated that the Instagram social media post would be resolved in the same proceeding as BG and Plaintiff's cross-complaints.

62.     Although Plaintiff expected a more immediate response, SBU's Code indicates this social media post was an undisputable violation of university rules, *See SBU's Code Section III.A.1.a* ("No student shall threaten . . . intimidate . . . or otherwise physically, psychologically, verbally, or in writing by electronic means or otherwise abuse any other person."), *and Section VII.C.5.a* ("Sexual Harassment" includes "sufficiently severe or pervasive" conduct such as "derogatory statements or other verbal abuse"), and so it seemed reasonable to believe that this clear violation of SBU's Code would, in fact, be resolved concurrently with the parties remaining alleged violations of SBU's Code at the Title IX Review Panel Hearing.

**PRE-HEARING PROCEDURES AND THE TITLE IX REVIEW PANEL HEARING**

63.     On July 31st, 2018, Defendant SBU delivered to Plaintiff the Notice of Charges and Notice of Review Panel Hearing scheduled to take place a mere ten (10) days later, on August 10, 2018, in which both parties' allegations would be adjudicated.

64.     As part of its process for adjudicating these types of "sexual misconduct" claims, SBU identifies sections of its code that the parties' allegations make out a violation of. In this instance, SBU identified charges for both BG and Plaintiff that were identical, namely Sections VII.C.5.b (for nonconsensual sexual contact), and VII.C.5.c (for nonconsensual sexual intercourse and/or penetration).

65.     SBU's Code states that a finding of 'Responsibility' as to sexual misconduct charges must be supported by a preponderance of the evidence standard.

66.     Although under the SBU Code, SBU does not permit respondents in a sexual assault hearing to have presentation or argument made by an attorney, they do permit respondents to have an Advisor at the hearing with them. That Advisor is not allowed to speak, but may render legal advice privately to respondents.

67.     SBU's July 31st, 2018 notification to Plaintiff informed him of these rules, and accordingly, on August 1, 2018, Plaintiff retained Undersigned Counsel as his Advisor.

68.     SBU's July 31st, 2018 notification also included instructions for submission of evidence pre-hearing.

69.     On August 2, 2018, Plaintiff's Advisor alerted Defendant Shane that the procedures expressed in the email Notice to Plaintiff were not in conformity with SBU's then operative procedural code for Title IX Hearings ("the August 2018 Code"). For example, whereas the August 2018 Code allows for a respondent to access SBU's Title IX Investigator's Report five (5) days

14

prior to the Hearing and to submit any rebuttal evidence to that report within two (2) days of the Hearing, the rules expressed in the email notification to Plaintiff stated that access to the Investigative Report would be granted only two (2) days prior to the Hearing, and that all evidence to be heard at the Hearing must be submitted before then, specifically at least five (5) days prior to the Hearing. No opportunity to submit rebuttal evidence after reviewing the Investigative Report would be (nor was) allowed.

70.     Defendant Shane refused to follow the August 2018 Code, instead arbitrarily choosing to follow the prior year's procedures that were no longer in effect.

71.     This severely prejudiced Plaintiff. When Plaintiff reviewed the Investigative Report, he determined he needed to submit certain messages as rebuttal evidence. Under the August 2018 Code (and under ordinary fundamental principles of due process) this would have been permissible. However, under the procedures Defendant Shane was selectively enforcing, Plaintiff was utterly precluded from submitting this evidence pre-hearing or indeed *ever*.

72.     On August 10, 2018, Plaintiff and BG appeared at the Title IX Review Panel Hearing ("the Hearing").

73.     The Hearing commenced with introduction of all parties at which time the Hearing Officer Defendant Haas informed Plaintiff's Advisor that the Advisor could not engage in any verbal presentation or questioning throughout the hearing (BG chose not to be accompanied by an advisor). Further, Defendant Haas advised that if either party or their Advisor engaged in any communication toward the other party, they would be removed from the hearing room and the Hearing would continue in their absence.

74.     Defendant Haas then introduced the three-member Review Panel, a trio of SBU faculty/staff. The Review Panel was constituted to hear the evidence and make a determination as to responsibility.

75.     Defendant Haas, by contrast, was tasked with running the proceedings. Defendant Haas's role was comparable to that of a judge and the Review Panel's role was comparable to a jury.

76.     Defendant Shane was also present within the Hearing Room during the Hearing.

77.     The Hearing began with SBU's Title IX Investigator providing a summary of her investigation which became available for the parties review two (2) days prior, and answering questions.

78.     After the investigator presented her report, BG made her opening statement in which she largely compared Plaintiff's behavior to that of notorious convicted felons.

79.     Plaintiff then gave his own opening statement expressing that he had no recollection of the alleged non-consensual anal penetration, and that he would not have consented to the sexual episode at all if he were sober.

80.     After opening statements, the parties were permitted to submit questions for the opposing party to the Hearing Officer Defendant Haas, who in her absolute discretion determined whether or not to ask the questions.

81.     The parties were not permitted to directly cross-examine one another.

82.     Accordingly, Plaintiff submitted a list of initial questions to Defendant Haas to be posed to BG.

83.     Defendant Haas refused or failed to pose numerous questions to BG, ostensibly on the basis of "relevance" and "appropriateness."

84.     During the Hearing, Defendant Haas even admitted while speaking to BG that "there were a substantial number of questions on [Plaintiff's list of questions] that I did not ask of you."

85.     Some examples of Plaintiff's submitted questions to BG that were not asked by Defendant Haas include, but are not limited to:

- "Did you think there was a chance that Plaintiff would reject your advances towards sex?" (This was critical because Plaintiff believes that BG knew that if Plaintiff was sober, he would not have agreed to inviting her over to his dorm so late.);

- "When did you first think about filing a Title IX complaint?" (The timing of BG's decision to file her Complaint is critical because while BG claims that she came to the decision after being urged to do so by others, Plaintiff sought to prove BG made this decision at or around the time of the sexual encounter on account of Plaintiff's failure to reciprocate emotional affection.);

- "Why, did you put on [as you stated within your posted online article] your 'cutest underwear' [prior to visiting Plaintiff]?" (Plaintiff's belief is that BG made an intentional effort to sexually engage Plaintiff with indifference towards his consent as she had no reason to believe consent would be granted based on their prior interactions and Plaintiff's denials, yet she clearly prepared for sex anyways.).

86.     Additionally, by being required to submit written questions to Hearing Officer Defendant Haas, which Defendant Haas sorted and rephrased prior to posing them, Plaintiff did not have the opportunity to ask timely follow up questions of BG.

87.     In addition, BG's responses to the questions that *were* posed to her demonstrated her complete lack of credibility and willingness to bear false testimony. *For example*:

- In response to "did you think [Plaintiff] was sexually experienced," BG gave several non-responses, but eventually stated "I don't have a belief on that." Her answer is inconsistent with her own Title IX Complaint in which she states "I know someone who is sexually experienced like [Plaintiff] did not make a mistake in differentiating between my vagina and anus."

- In response to why after her sexual encounter BG prefaced her request to come over to AH's dorm room with, "this isn't a booty call," BG responded "because I didn't want to be touched again," which is not true because BG specifically requested to and did cuddle with AH in his bed that night.

- In response to being asked whether Plaintiff showed BG inadequate care and affection, BG stated "I didn't care that he wasn't affectionate." This conflicted with BG's statements within her online article/Blog in which she ruminated over the lack of emotional and physical attention Plaintiff showed her, the difference in Plaintiff's initially warm tone before their sexual encounter and his distant feel afterward, as well as how she and Plaintiff used to be friends;

- BG responded "No" when asked "did you tell anybody that you thought [Plaintiff] was high that night?" which is blatantly untrue as her own submitted messages conveyed "He was high," and "I was Sober" and "He was a little High";

- When asked whether BG would have reported Plaintiff if he had apologized as BG requested, BG responded by stating "he did apologize," which conflicts with BG's numerous assertions stating Plaintiff would not apologize, as well as

when asked why BG told Plaintiff he was "bad in bed," BG responded "because
he was unapologetic and I hated him and I still do."

88.     In sum, BG repeatedly contradicted herself, and, even in the absence of cross-
examination, demonstrated lack of credibility. Cross-examination or even the mere opportunity
for proper follow up questioning would likely have elucidated many greater inconsistencies.

89.     In addition to Defendants denying Plaintiff an opportunity to confront his accuser,
Defendants further prejudiced Plaintiff's defense by arbitrarily applying the procedural rules of
SBU's Code inconsistently.

90.     SBU's Code, *effective August 1, 2017*, stated that all evidence must be submitted at
least five (5) days prior to the date of the Hearing.

91.     Plaintiff submitted various evidence prior to the five-day cutoff date, however
within two (2) days of the hearing, and after reviewing the Investigator's report, *See supra* ¶ *69*,
Plaintiff determined there was additional critical evidence that he needed to submit. Specifically,
he sought to submit text messages between himself and BG that were not in the record.

92.     Defendants refused Plaintiff's proposed submission as untimely.

93.     However, Defendants allowed BG to flagrantly violate the same provisions of
SBU's Code without any reason.

94.     For example, at the Hearing, BG called two witnesses, both of whom appeared via
telephone conference. Plaintiff objected to one of these witnesses being called due to the fact that
BG failed to provide notice of said one witness within the applicable five-day time frame under
SBU's Code.

95.     In response to Plaintiff's objection, Defendant Haas simply stated the Defendants
would "take [the evidence] for what it's worth."

96.     Plaintiff renewed his objection later in the Hearing and again requested that the text messages between himself and BG—notice of which was given to Defendants two (2) days prior to the Hearing—be submitted to the Review Panel since BG was permitted to produce a witness without *any* prior notice. Defendant Haas then offered the incoherent rationale that "[w]itnesses are not evidence."

97.     Defendants also allowed BG to violate SBU's Code by permitting her to introduce various character witnesses in contravention to Defendant SBU's prohibition of character witness testimony during the Hearing.

### DEFENDANTS PERMITTED BG'S SUBMISSION OF A NEW INCONSISTENT WRITTEN STATEMENT FROM A CRUCIAL WITNESS BUT FAILED TO PERMIT PLAINTIFF AN OPPORTUNITY TO QUESTION THE WITNESS

98.     Defendants also remarkably vetoed Plaintiff's attempt to cross-examine BG's most critical third-party witness—AH.

99.     AH was interviewed by Defendant SBU's Investigator during the University's investigation and the notes of said interview were made a part of the Investigator's report concerning the sexual misconduct complaints from both BG and Plaintiff.

100.    The Investigator's report reflects that AH made absolutely *no* mention of any nonconsensual sexual activity, including anal penetration.

101.    Yet, prior to the Hearing, BG submitted to Defendants an undated supplemental written statement purportedly authored by AH (hereinafter referred to as "AH's Supplemental Statement").

102.    AH's Supplemental Statement was undated and failed to include any notary's signature or stamp, nor any verification of AH's signature or identity.

103.    AH's Supplemental Statement described AH's interactions and conversations with BG in the early morning hours of March 6, 2018.

104.    AH's Supplemental Statement was extremely inconsistent with the interview notes from SBU's Title IX Investigator's interview with AH.

105.    Unlike AH's interview with SBU's Investigator, AH's Supplemental Statement conveniently omitted mention of BG's request to cuddle with AH in his bed, nor did it include BG's assertion that Plaintiff was "bad at sex and she did not enjoy it," nor did it include that BG compared her sexual interaction to "how a guy would be in a porno like no eating her out and stuff," and further it did not include that BG left Plaintiff's dorm "because she was kind of angry."

106.    Yet, within AH's Supplemental Statement, AH *did* (for the first time) make reference to BG's allegation of anal penetration.

107.    BG *admitted at the hearing* that AH's Supplemental Statement was authored at BG's direction and that she explicitly directed AH to include a reference to anal intercourse within it. Defendants nonetheless considered AH's Supplemental Statement as competent evidence.

108.    In light of the substantial discrepancies between SBU's Investigator's interview and AH's Supplemental Statement, Plaintiff requested to call AH as a witness at the Hearing.

109.    The Review Panel initially requested BG produce AH's contact information.

110.    However, BG protested, "He does not want to – **we can't**."

111.    Without further inquiry, Defendant Haas then asserted that BG was "Right. We can't compel any – this is not a court proceeding where we can subpoena people."

112.    However, Plaintiff made no request that AH be compelled, he merely requested to call AH and see if he would offer testimony (especially since BG was allowed to offer telephonic

testimony from her other witnesses). AH never expressed any indication that he would not testify at the Hearing, instead Defendant Haas appeared to take BG at her word that he "did not want to."

113.     Defendants made no attempt to contact AH after BG submitted the inconsistent AH's Supplemental Statement.

114.     Plaintiff was thus deprived the ability to explore the inconsistencies between the written statement and the Investigator's report, and to ask and inquire into numerous other critical issues such as (a) whether AH even authored the written statement, or (b) if AH's Supplemental Statement was dictated verbatim by BG.

## OTHER EXAMPLES OF DISPARATE TREATMENT AT THE HEARING

115.     In addition to SBU's flagrant constitutional violations and explicit selective and inconsistent enforcement of its own procedural rules, the Hearing was also rife with numerous additional examples of egregious disparate treatment.

116.     For example, when BG exhibited difficulty in responding to certain posed questions or attempted to evade questions with non-responsive answers, Defendant Haas assisted BG by "trying to guide [BG] along the way" and even suggesting answers. Some examples include:

> • "MS. HAAS: Did you perceive that [Plaintiff] was into it regarding the intercourse? You did say he did all the work, but for the record, was your opinion that he was into it? Into the sexual encounter?
>
> BG: He was groaning, a lot.
>
> MS. HAAS: Okay. So your answer was -- is that he was into it?
>
> BG: Yes"
>
> (BG's motivation for filing her Complaint was crucial to Plaintiff's defense. BG's belief as to whether Plaintiff failed to adequately reciprocate her romantic

feelings is important in demonstrating that BG responded to Plaintiff's rejection with retaliation. BG witnessing Plaintiff "groaning" is not indicative of anything regarding the sexual encounter);

And,

- "MS. HAAS: How about the messages between 8:12 p.m. on March 8th to 2:53 a.m. on March 9th, did you purposefully omit those Facebook messages?

  BG: Again, he asking about time stamps as if I have my phone memorized. I don't.

  MS. HAAS: Okay.

  BG: If you want me to do that, I will.

  MS. HAAS: So your answer is you didn't purposefully omit those?

  BG: My answer is those -- yes."

  (The details and timeline of BG's submitted messages are important in demonstrating BG purposefully curated her messages to the Review Panel to prevent submission of detrimental evidence. BG was allowed to evade providing responses regarding information BG had sole personal knowledge of.)

117. Plaintiff was not assisted with any of his responses during questioning.

118. Defendant Haas and the Review Panel attempted to assist BG in constructing her answers by providing suggestive follow-up questions when BG introduced conflicting testimony. These follow-up questions assisted BG in attempting to rectify her conflicting testimony and attempting to mitigate detrimental statements. On the other hand, the Review Panel asked Plaintiff questions designed to entrap Plaintiff into conceding certain portions of BG's prior *written* version

of events, as well as repeatedly requesting explanations from Plaintiff of statements taken out of context. In short, the transcript shows that Defendants operated as BG's allies throughout the Hearing, and as Plaintiff's adversaries.

119.    During the Hearing, Defendant Haas and the Review Panel also provided encouragement to BG, and on numerous occasions reiterated for BG to take her time. In contrast, Plaintiff was denied a 45-minute break, after the full day of proceedings, in order to prepare his Closing statement.

120.    During the Hearing, when BG could not recall an answer, Defendants would accept this response and move on to new questions.

121.    In contrast to Defendants' supportive demeanor towards BG during the Hearing, Defendants sought to elicit culpable answers from Plaintiff; asked the same questions of Plaintiff multiple times even after Plaintiff would respond that he did not recall; and even ignored clarifications Plaintiff made to prior answers, all in an effort to find some possible basis for determining Plaintiff to be 'Responsible' of the charges alleged by BG.

122.    This disparate treatment between BG and Plaintiff reached a crescendo when during closing statement, Defendants permitted BG to verbally assault Plaintiff even while expressly acknowledging that her verbal offensive ran afoul of SBU's Code.

123.    At *multiple* points during BG's Closing remarks, Hearing Officer Defendant Haas interjected to note BG's breaches of conduct, but Defendant Haas continued "allowing [BG] leeway" throughout her Closing. Although Defendant Haas was aware of and noted BG's breaches of conduct, stating "[t]his is not the time for insults", "confine yourself to your arguments," and "it's not supposed to be for you to…go after him," Defendant Haas consistently failed to restrain BG from continuing to run afoul of SBU's rules against insults and ad hominem attacks by "trying

24

to give [BG] a lot of leeway" and even admitting "I wouldn't allow [Plaintiff] to say the same things."

124.    The gender-based disparate treatment of male Plaintiff compared to BG was evident as Defendants assisted BG by admittedly "trying to guide [BG] along the way" while they "allowed [BG] a lot of leeway" to the substantial detriment of Plaintiff.

## DEFENDANTS' ULTIMATE FINDING OF RESPONSIBILITY WAS MOTIVATED BY GENDER

125.    On August 22, 2018, Defendant SBU issued and delivered the Disposition of the Hearing to Plaintiff, thereby informing him of the finding of his Responsibility to the charges and the University's rational therefore.

126.    SBU's standard of review for determining whether sexual misconduct has occurred is a preponderance of the evidence standard.

127.    The Review Panel's determination that Plaintiff was 'Responsible' for sexual misconduct is not supported by *any* credible evidence, much less a preponderance of the evidence as the Review Panel's Disposition and the Hearing transcript plainly demonstrate.

128.    The Review Panel's Disposition provided three bases for concluding that (A) anal penetration occurred and (B) that it was nonconsensual (i.e. that Plaintiff was 'Responsible' for violating SBU's Code):

- *First*, "the similarities of the parties' accounts up until the point of [alleged] anal penetration."

- *Second*, "the respondent acknowledged that his penis 'slipped.'"

- *Third*, the respondent "conceding 'it may have been a mistake.'"

25

129. The first basis cannot conceivably support the finding that anal penetration occurred. This is a mere restatement of the fact that both parties acknowledge that vaginal intercourse and other sexual activity was occurring before the alleged anal penetration. This activity was, *according to BG*, consensual. The fact that BG alleges consensual vaginal conduct occurred cannot support a finding that nonconsensual anal intercourse also occurred.

130. The second basis likewise offers zero support for finding Plaintiff 'Responsible.' Indeed, Plaintiff acknowledged "[his] penis slipped out of [BG]'s vagina" during sex, but he explicitly added that regardless of any "slip out" anal penetration did not occur "not for a moment, let alone 6-7 seconds as [BG] asserts." Accordingly, this statement is in no way an admission as to penetration, as Defendants claimed.

131. And the third basis offers no support as well because *Plaintiff did not make this statement*.

132. Instead, as the hearing transcript plainly demonstrates, the Review Panel Disposition is referring to *hypothetical* statements Plaintiff made at the hearing. *I.e.*, "if," contrary to his drunken and broken recollection, "anal penetration occurred, it would have been a mistake."

133. Indeed, each time Plaintiff posed his hypothetical responses, he would reiterate that no actual anal penetration occurred.

134. It is no surprise that Plaintiff was forced to speak in hypotheticals at the hearing; after all, he was heavily intoxicated during the encounter with BG (while BG was sober).

135. Under these circumstances Plaintiff's hypothetical explanation for conduct he did not even believe occurred cannot support the conclusion that anal penetration in fact occurred.

136.    In addition, even assuming arguendo that anal penetration occurred, there is literally *no* rationale provided in SBU's Review Panel Disposition that supports the finding that BG did not *consent* to the penetration.

137.    Concurrently, Defendants failed to find BG 'Responsible' of any violations of SBU's Code, even though there was incontrovertible evidence of such violations.

138.    For example, SBU's Code provides that an individual may not be able to consent to sexual activity if intoxicated.

139.    Plaintiff in fact claimed he was too intoxicated to consent *and* that BG *knew* he was intoxicated.

140.    There was copious evidence in the record supporting that Plaintiff was in fact intoxicated, including BG's *own* online article/Blog, BG's own statements within her messages with acquaintances, as well as the testimony of Plaintiff's witnesses presented at the hearing.

141.    During the Hearing, Plaintiff called two (2) witnesses, both of whom, testified that Plaintiff was intoxicated during the night of the alleged sexual misconduct and that BG either knew of such intoxication or, at a minimum, such intoxication would have been plainly visible to a reasonable person.

142.    One of the two witnesses was the former supervisor for both Plaintiff and BG in the job that they shared prior to college.

143.    BG contacted this individual (in his capacity as her friend) the day following the sexual episode. During the call, BG complained that Plaintiff was being "distant" after their sexual encounter, and that "[Plaintiff] didn't really want to talk to her."

144.    The former supervisor physically appeared at the Hearing and testified that BG was aware of Plaintiff's intoxicated state during the night of the alleged sexual misconduct.

Specifically, the former supervisor testified that BG admitted to the supervisor that she was sober during the sexual episode and that Plaintiff was not. Plaintiff was intoxicated during the relevant episode.

145.   Yet, whereas the Review Panel found Plaintiff 'Responsible' based on the aforementioned deficient evidence, it inexplicably found BG '*Not* Responsible' for the allegation that she had sex with someone that couldn't consent on a count of intoxication, notwithstanding the voluminous evidence of Plaintiff's intoxication and BG's knowledge thereof.

146.   In addition, the Review Panel likewise found BG 'Not Responsible' for any SBU violations notwithstanding the uncontroverted evidence in the form of her Instagram post that openly incited violence against Plaintiff; which BG admitted to authoring. There was no evidence introduced to either rebut that this was her Instagram post or to even mitigate the circumstances of the post.

147.   Given how similarly situated Plaintiff and BG were (i.e. cross complainants in the same title IX proceeding), and given the flagrant disparate treatment, there is no inference that can be made other than that gender was the sole cause of the clearly differing treatment BG and Plaintiff received from Defendants.

**THE INTERNAL APPEAL**

148.   On August 29th, Plaintiff appealed the 'Responsible' determination to Defendant SBU's Community Standards Appeals Board and Defendant Shane.[6] (Upon information and belief, Defendant Shane operates SBU's Community Standards Appeals Board.)

149.   Among other things, the appeal claimed the Review Panel's determination was improper because (a) there was insufficient evidence as noted *supra ¶¶ 127-136* (b) Plaintiff was

---

[6] An updated version of the appeal was submitted September 10, 2018 after Plaintiff obtained and reviewed the Hearing transcript.

denied the opportunity to question a critical witness, (c) Plaintiff was denied an opportunity to cross-examine BG, and (d) Defendant SBU failed to follow its own Code and procedures. In addition, Plaintiff argued that the Review Panel's decision was the result of gender discrimination in violation of 20 U.S.C. §1681, *et seq.*

150.    Plaintiff also noted within his appeal that the 6th Circuit's recently decided *Doe v. Baum* 903 F.3d 575 (6th Cir. 2018) provided that failure to allow cross-examination of complainant and their witness(es) in a University sexual misconduct hearing constitutes a clear due process violation.

151.    Defendants rendered a decision on Plaintiff's appeal on September 17, 2018.

152.    Regarding evidence, the decision simply noted that the Review Panel's evidence "was reviewed and deemed sufficient and proper."

153.    Regarding failure to allow cross-examination, the decision noted that "it is the role of the hearing officer to vet all questions…and deem their relevancy."

154.    Defendants completely and utterly disregarded their constitutional obligation, as noted in *Baum*, by failing to even address the due process requirement for cross-examination, much less explain why it was not provided here.

155.    Regarding opportunity to question the critical third party (AH), the Appeal Board decision stated that "Stony Brook University cannot command or require any party, including witnesses, to participate in hearings." Although as noted *supra at ¶ 112,* Plaintiff was not seeking to *compel* AH's appearance, the Appeals decision further noted that "the hearing officer [Defendant Haas] informed the panel and parties that [AH] did not want to be a participant of the hearing." This is false, BG was the only person at the Hearing to offer an opinion as to AH's intent.

156.    The appeals decision also did not address the gender discrimination Plaintiff documented in his appeal.

## PLAINTIFF SUFFERED SUBSTANTIAL HARM AS A RESULT OF DEFENDANTS' ACTIONS

185.    Plaintiff has suffered substantial and ongoing harm as a result of Defendant's action, including the Review Panel finding a determination of 'Responsible' as to the Sexual misconduct claims and the appeals decision upholding that decision.

186.    Plaintiff suffered and continues to suffer harm to his reputation. Although, university Title IX hearings are designed to be confidential, word about the determination nonetheless has many ways of leaking into the broader university community. Plaintiff's only viable responses to someone asking why he is suspended are either to tell the truth and thereby harm his reputation or lie.

187.    As an automatic consequence of being found 'Responsible' for a violation of SBU's Code, Plaintiff lost his presidential scholarship ($4500/year).

188.    As a result of the suspension incurred, Plaintiff also lost a semester of his life. He is not able to obtain gainful employment until he obtains his degree, and Defendants' action have set Plaintiff back at least a semester in pursuit of his degree.

189.    Plaintiff will also suffer immeasurable employment consequences in the future as a result of the notation on his University transcript indicating that he was found 'Responsible' for Sexual Misconduct. Even if this notation is removed, future prospective employers may still inquire into Plaintiff's missed semester and ultimately ask whether he was in fact found 'Responsible' for Sexual Misconduct violations or another type of violation.

190.    The notation on Plaintiff's transcript will likewise make it very difficult, if not impossible to transfer to another education institution. Under the Family Educational Rights and

Privacy Act (FERPA) regulations, Plaintiff's SBU disciplinary record may be obtained by any institution at which Plaintiff may be enrolled in the future. *See* 34 C.F.R. § 99.31. If that institution has the requisite notice in its internal policies, then SBU need not obtain Plaintiff's consent to send his disciplinary record. *See id.*

191.    Plaintiff has also suffered tremendous pain and suffering.


## CLAIMS

### 1.  42 U.S.C. § 1983 –Fourteenth Amendment Procedural Due Process Property and Liberty Interests

192.    Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

193.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

194.    The Fourteenth Amendment due process protections are required in higher education disciplinary decisions at public institutions.

195.    Plaintiff was entitled to a meaningful opportunity to be heard, to question his accuser, and to examine critical witnesses.

196.    Plaintiff has a protected liberty interest in his good name, reputation, honor, and integrity which he cannot be deprived of by the State absent due process.

197.    Plaintiff has a protected liberty interest in pursuing his education at a public university, which the state cannot deprive him of absent due process.

198.    Plaintiff also has a protected liberty interest in his future educational and employment opportunities, which the state cannot deprive him of absent due process.

31

199.    Plaintiff was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. Here the allegations were of the utmost seriousness, have lifelong ramifications, and were quasi-criminal in nature.

200.    Plaintiff had a significant interest in avoiding suspension, expulsion and enjoying adjudication by an impartial panel.

201.    Plaintiff has been and will continue to be forced to tell other institutions about the finding of sexual misconduct against him, as well as friends and family.

202.    Because the University provided an appeals process, it had the obligation to ensure that the process was completed in accordance with due process principles.

203.    Plaintiff's liberty and property interests were invaded by Defendants when the Review Panel determined Plaintiff had violated SBU's Code and the Appeals Board upheld said decision, amounting to an erroneous result without due process of law having been administered.

204.    Defendants knew that the Title IX Hearing included serious constitutional violations, including failure to allow cross-examination and failure to question a critical third-party witness.

205.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer irreparable harm, injury, and damages, including but not limited to denial of educational opportunities; a permanent disciplinary record which he will have to contend with and explain for the rest of his life; denial of future educational and employment opportunities including undergraduate, graduate school and career choices; false, permanent findings and discipline on his record for serious sexual misconduct which did not occur; damage to his standing and associations in his community and imposition of a stigma or other disability

that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

### 2. Title IX, 20 U.S.C. § 1681–88 – Disparate Treatment Based on Sex

206. Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

207. Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §1681, *et seq.* prohibits discrimination on the basis of sex in educational institutions, including Defendant SBU.

208. Title IX applies to an entire school or institution if any part of that school receives federal funds.

209. Defendants receive federal funding.

210. Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to adopt and publish grievance procedures providing for the "prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. *See* 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice). Such prohibited actions include all forms of sexual harassment, including sexual misconduct. *See generally* U.S. Dep't of Ed., Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX* (2001) at 19–20, 21 & nn. 91–101.

211. A school must therefore provide, at a minimum, "[a]dequate, reliable, and impartial investigation of complaints." *See id.*

212.   A school also has the obligation under Title IX to ensure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment," including sexual misconduct. *See id.*

213.   Defendants have violated Plaintiff's rights under Title IX by treating him differently because of his sex and/or gender.

214.   A fair reading of the Review Panel Hearing Disposition and Appeals Board Decision demonstrate that Plaintiff and BG were treated differently based on their genders and/or sex. Specifically, Defendants allowed BG to violate multiple procedural rules that were enforced against Plaintiff, found Plaintiff 'Responsible' notwithstanding the lack of legitimate evidence in support, and failed to find BG 'Responsible' notwithstanding overwhelming uncontroverted evidence in support.

215.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered and will continue to suffer irreparable harm, injury, and damages, including but not limited to denial of educational opportunities; a permanent disciplinary record which he will have to contend with and explain for the rest of his life; denial of future educational and employment opportunities including undergraduate, graduate school and career choices; false, permanent findings and discipline on his record for serious sexual misconduct which did not occur; damage to his standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## RELIEF REQUESTED

Wherefore, Plaintiff demands relief as follows:

1.      Injunctive relief directing that Defendants remove all notations on Plaintiff's transcript and record indicating violations of SBU's Code, and removal of any and all references to the allegations or investigation at issue, including any discipline or sanctions, from Plaintiff's files and records;

2.      An injunction out of this Court prohibiting any further acts of wrongdoing or retaliation against Plaintiff;

3.      Compensatory damages in whatever amount he is found to be entitled;

4.      Punitive damages in whatever amount he is found to be entitled; and,

5.      A declaration that Defendants have violated Plaintiff's Constitutional Rights, Right to Due Process, and Plaintiff's right to be free of gender discrimination under Title IX;

6.      An award of interest, costs, and reasonable attorneys' fees;

7.      Whatever other relief this Court deems just and proper


Dated: December 30, 2018
       New York, N.Y

                                        /s/ Stanislav Gomberg
                                        GOMBERG LEGAL, P.C.
                                        By: Stanislav Gomberg, Esq.
                                        *Attorney for Plaintiff*
                                        1001 Avenue of the Americas
                                        Suite #1222
                                        New York, NY 10018

# VERIFICATION

STATE OF New York                            )
                                                       ) ss.:
COUNTY OF New York                       )

**Mohammad Nehmeh** being duly sworn, deposes and says that I am the plaintiff (John

Doe) in the case captioned "John Doe v. Tracy Haas, Suzanne Shane, and The State

University of New York at Stony Brook" to be filed in the Eastern District of New York,

and have authorized the filing of this complaint. I have reviewed the allegations made in

the complaint, and to those allegations of which I have personal knowledge, I believe

them to be true. As to those allegations of which I do not have personal knowledge, I rely

on the documents mentioned within the filing and I believe them to be true.


                                                                   Mohammad Nehmeh

Sworn to me this 2nd
day of January, 2018.


Notary Public

STANISLAV GOMBERG
NOTARY PUBLIC-STATE OF NEW YORK
No. 02GO6348617
Qualified In Westcheser County
My Commission Expires 10-03-2020